**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 28, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENth CIRCUIT

---

STATE OF NEW MEXICO ex rel. BILL
RICHARDSON, Governor, GARY KING,
Attorney General,* NEW MEXICO
ENERGY, MINERALS AND NATURAL
RESOURCES DEPARTMENT, NEW
MEXICO DEPARTMENT OF GAME AND
FISH, NEW MEXICO ENVIRONMENT
DEPARTMENT, and KATHERINE SLICK,
New Mexico State Historic Preservation
Officer; NEW MEXICO WILDERNESS
ALLIANCE; WILDERNESS SOCIETY;
SIERRA CLUB; NATURAL RESOURCES
DEFENSE COUNCIL; NATIONAL
WILDLIFE FEDERATION; SOUTHWEST
ENVIRONMENTAL CENTER; FOREST
GUARDIANS; NEW MEXICO WILDLIFE
FEDERATION,

      Plaintiffs–Appellees–Cross-
      Appellants,

  v.

BUREAU OF LAND MANAGEMENT;
MIKE POOL, Director, Bureau of Land
Management; LINDA RUNDELL, New
Mexico State Director, Bureau of Land
Management; BENJAMIN N. TUGGLE, in
his official capacity as the Regional
Director, Region 2, U.S. Fish and Wildlife
Service; ROWAN W. GOULD, in his
official capacity as the Director of the U.S.
Fish and Wildlife Service; UNITED
STATES FISH AND WILDLIFE SERVICE;

Nos. 06-2352, 06-2353, 06-2354

KEN SALAZAR, in his official capacity as Secretary of the Interior; UNITED STATES DEPARTMENT OF THE INTERIOR,[**]

    Defendants–Cross-Appellees,

  and

INDEPENDENT PETROLEUM ASSOCIATION OF NEW MEXICO,

    Intervenor-Defendant–Appellant–Cross-Appellee.

---

**Appeal from the United States District Court for the District of New Mexico (D.C. No. CV-05-460 BB/RHS)**

---

Ronald Walter Opsahl (William Perry Pendley with him on the briefs), Mountain States Legal Foundation, Lakewood, Colorado, for the Intervenor-Defendant–Appellant–Cross-Appellee.

Alletta Belin, Belin & Sugarman, Santa Fe, New Mexico (Stephen F. Farris and Judith Ann Moore, Office of the Attorney General, State of New Mexico with them on the briefs) and James Angell (Andrea L. Zaccardi with him on the briefs), Earthjustice, Denver, Colorado for Plaintiffs–Appellees–Cross-Appellants State of New Mexico, et al.

Elizabeth Peterson (Arthur Arguedas, Office of the Solicitor, U.S. Department of the Interior and Ronald J. Tenpas, Assistant Attorney General, Andrew A. Smith,

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Gary King is substituted for Patricia A. Madrid.

[**] Pursuant to Fed. R. App. P. 43(c)(2), Mike Pool is substituted for Kathleen Clarke, Benjamin N. Tuggle is substituted for H. Dale Hall, Rowan W. Gould is substituted for Steven A. Williams, and Ken Salazar is substituted for Gale Norton.

Aaron P. Avila, and Andrew C. Mergen with her on the briefs), U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C., for Defendants–Cross-Appellees Bureau of Land Management, et al.

Before **LUCERO**, **ANDERSON**, and **O'BRIEN**, Circuit Judges.

**LUCERO**, Circuit Judge.

This litigation concerns the environmental fate of New Mexico's Otero Mesa, the largest publicly-owned expanse of undisturbed Chihuahuan Desert grassland in the United States. From 1998 to 2004, the Bureau of Land Management ("BLM" or "the Agency") conducted a large-scale land management planning process for federal fluid minerals development in Sierra and Otero Counties, where the Mesa is located. Ultimately, the Agency opened the majority of the Mesa to development, subject to a stipulation that only 5% of the surface of the Mesa could be in use at any one time. Invoking the National Environmental Policy Act ("NEPA"), the Federal Land Management Policy Act ("FLPMA"), and the National Historic Preservation Act ("NHPA"), the State of New Mexico and a coalition of environmental organizations led by the New Mexico Wilderness Association ("NMWA") challenged in federal district court the procedures by which BLM reached this determination. NMWA also challenged BLM's decision not to consult with the Fish and Wildlife Service ("FWS") under the Endangered

Species Act ("ESA") regarding possible impacts of the planned development on the Northern Aplomado Falcon.

The district court rejected these challenges, save for the plaintiffs' argument that BLM erred in beginning the leasing process on the Mesa before conducting additional analysis of site-specific environmental impacts flowing from the issuance of development leases. Discerning serious flaws in BLM's procedures, we affirm the district court's conclusion that NEPA requires BLM to conduct site-specific analysis before the leasing stage but reverse its determination that BLM's plan-level analysis complied with NEPA. Moreover, we affirm its conclusion that BLM complied with public comment provisions in FLPMA, and we vacate as moot the portion of the district court's order addressing NMWA's ESA claims.

**I**

Within Sierra and Otero counties in southern New Mexico lie the northern reaches of the richly biodiverse Chihuahuan Desert. Among the several habitats comprising this desert ecosystem is the Chihuahuan Desert grassland, much of which has depleted to scrubland over the past century and a half. A New Mexico State University biology professor identifies this grassland as the most endangered ecosystem type in the United States. The Otero Mesa, which BLM seeks to open to oil and gas development upon conclusion of the planning process that is the subject of this litigation, is home to the endangered Northern

Aplomado Falcon, along with a host of other threatened, endangered, and rare species. Only a few, unpaved roads traverse the Mesa. Lying beneath it is the Salt Basin Aquifer, which contains an estimated 15 million acre-feet of untapped potable water. Recognizing the importance of this valuable resource, the state of New Mexico and many citizens and environmental groups have sought to prevent development.

A

BLM manages some 1.8 million acres of surface land and 5 million acres of subsurface oil, gas, and geothermal resources in Sierra and Otero Counties. This includes the 427,275-acre Otero Mesa. Until recently, these resources were managed under the terms of a 1986 resource management plan (the "RMP"), see 43 C.F.R. § 1601.0-5(n), which contained no overall guidance on the management of fluid minerals development, leaving management decisions to be made on a case-by-case basis.[1] Because the area saw relatively little oil and gas exploration, BLM relied on the plan without incident for a decade and issued few development leases during this time.

---

[1] BLM's organic act, FLPMA, requires BLM to manage fluid resource development on federal lands using a three-step process. First, BLM develops an area-wide resource management plan, specifying what areas will be open to development and the conditions placed on such development. 43 U.S.C. § 1712(a). Second, BLM may grant leases for the development of specific sites within an area, subject to the requirements of the plan. § 1712(e); see also 43 C.F.R. § 1610.5-3. Finally, after exploring the leased lands, a lessee may file an application for permit to drill ("APD"), which requires BLM review and approval. 43 C.F.R. § 3162.3-1(c).

- 5 -

This state of affairs was upended in 1997, when a Harvey E. Yates Company ("HEYCO") exploratory well struck natural gas on the Otero Mesa. The strike occurred on a parcel designated the Bennett Ranch Unit ("BRU"). Oil and gas companies quickly responded by nominating over 250,000 acres in the area for federal leases. See § 3120-3.1. BLM determined that under the terms of then-existing internal policy, the increased development interest required the Agency to issue a management plan specifically governing fluid mineral resources. See BLM Handbook H-1624-1 (1990); BLM Manual §§ 1620.06(A), 1620.2 (1986). Accordingly, BLM asked existing leaseholders to voluntarily suspend their leases and began the process of amending the RMP to address possible oil, gas, and geothermal development.[2] See Notice of Intent to Prepare a Resource Management Plan Amendment and Environmental Impact Statement, 63 Fed. Reg. 55404 (Oct. 15, 1998). The stated goals of the amendment process were to determine which public lands in Sierra and Otero Counties should be available for leasing and development and to direct how leased lands would be managed. Id. at 55405.

Amending a resource management plan is a "major federal action" whose potential environmental impacts must be assessed under NEPA. 42 U.S.C.

---

[2] Not all existing leaseholders chose to suspend their leases. Since the amendment process began, HEYCO has submitted and BLM has approved six APDs. One of these permits has allowed HEYCO to commence drilling at the location of its initial gas strike.

§ 4332(C); see also Utah Shared Access Alliance v. Carpenter, 463 F.3d 1125, 1131 (10th Cir. 2006). Consequently, in October 2000, BLM issued a "Draft Resource Management Plan Amendment and Environmental Impact Statement for Federal Fluid Minerals Leasing and Development in Sierra and Otero Counties" (the "Draft EIS"). As NEPA requires, the Draft EIS analyzed several possible alternative management schemes for oil and gas development in the area. See 42 U.S.C. § 4332(C)(iii); 40 C.F.R. § 1502.14. Of the five alternatives identified, three were fully analyzed in the Draft EIS. The other two were eliminated without further analysis.

Both eliminated alternatives would have increased the level of environmental protection for the entire plan area beyond the level provided under existing management or any of the fully analyzed alternatives. One would have done so through a blanket ban on minerals development leasing; the other, through a "no surface occupancy" ("NSO") stipulation allowing minerals development only by slant drilling from non-BLM lands. These alternatives were "considered initially but eliminated prior to further analysis" based on the conclusion that adopting a plan which so limited development would be arbitrary and capricious under FLPMA's multiple-use mandate.[3] See 43 U.S.C. § 1702(c).

[3] "'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put, 'including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic,

(continued...)

- 7 -

BLM also discounted one of the three alternatives analyzed in the Draft EIS: the "No-Action Alternative," or the option of taking no new planning action. After fully analyzing its likely impacts, BLM determined that the No-Action Alternative was not in compliance with its own policies.

Thus, BLM was left with two possible management schemes, "Alternative A" and "Alternative B." Of the two, Alternative A placed fewer restrictions on development, and BLM selected it as the preferred alternative. See 40 C.F.R. § 1502.14(e). Alternative A opened 96.9% of the plan area but placed limitations on possible development, subjecting 58.9% of the area to a combination of NSO stipulations, controlled surface use stipulations, and timing stipulations. Of particular relevance to this litigation, Alternative A subjected 116,206 acres of the Otera Mesa and 16,256 acres of the adjoining Nutt Desert Grasslands to an NSO provision allowing surface disturbance only within 492 feet of existing roads. BLM crafted this NSO restriction "[t]o protect portions of the remaining desert grassland community by minimizing habitat fragmentation."[4]

---

[3](...continued)
scientific and historical values.'" Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 58 (2004) (quoting 43 U.S.C. § 1702(c)).

[4] As explained in the Draft EIS:

Habitat fragmentation is the division of an extensive habitat into smaller habitat patches. Generally, the effects of habitat
(continued...)

Also relevant to this litigation, the Draft EIS analyzed the potential impact on groundwater in the plan area only in general terms, without identifying or discussing specific aquifers such as the Salt Basin Aquifer. The Draft EIS concluded that in the construction phase of development:

> The possibility for degradation of fresh water aquifers could result if leaks or spills occur from pits used for the storage of drilling fluids, or if cathodic protection wells associated with pipelines are installed in a manner that allows for the commingling of shallow surface aquifers. However, since impacts would occur only if the governing regulations fail to protect the resource, the impact is not quantifiable.

As for the production phase, the Draft EIS was equally cursory. It stated that "[p]roduction of an oil and gas well typically would not have a direct impact on groundwater resources" because regulations require that "[a]ll oil and gas wells must have a casing and cement program . . . to prevent the migration of oil, gas, or water . . . that may result in degradation of groundwater." Id.; see 43 C.F.R. § 3162.5-2(d). Finally, the Draft EIS concluded that disposal wells, which are

------

[4](...continued)
fragmentation include: (1) the reduction of the total amount of a habitat type and apportioning the remaining habitat into smaller, more isolated patches . . ., (2) the creation of disturbed land which provides habitat for new, often exotic or weedy species . . ., and (3) the increase in the amount of edge to remaining communities. This increases predation and modifies plant composition even within the undisturbed area . . . .

. . . .

. . . As the plant communities change, the wildlife composition of the area also shifts. . . . Loss may occur of area-sensitive species.

"used for the disposal of waste [by injection] into a subsurface stratum," 40 C.F.R. § 146.3, would not lead to significant impacts because applicable casing and cement construction requirements and aquifer criteria would be followed and would prevent contamination. § 146.22 (listing construction requirements for Class II wells, including casing and cementing); see generally § 144 ("Underground Injection Control Program").

After releasing the Draft EIS, BLM accepted public comments for a 195-day period and held six public meetings to discuss it. See Notice of Availability and Public Hearings, 65 Fed. Reg. 69329 (Nov. 16, 2000); see also 40 C.F.R. § 1506.6(b) & (c) (requiring agencies to provide public notice of the availability of environmental documents and hold public meetings "whenever appropriate"). Nearly 300 oral and written comments were received, and BLM recognized that a majority of these addressed the need to protect the Otero Mesa grassland.[5] Numerous public comments expressed concern that the NSO stipulation, which exempted areas within 492 feet of existing roads, was insufficient to prevent fragmentation of the Otero Mesa grassland habitat. A Vice President of HEYCO commented that the resources underlying Otero Mesa would not likely be accessible via directional drilling, and thus, "Alternative A has the effect of closing 160,000+ acres to fluid mineral development." In response to all of these

---

[5] In addition, BLM's Las Cruces Field Office received over 350 written comments regarding the Draft EIS and approximately 3,200 comments via email.

comments, BLM announced that it would reevaluate Alternative A in the Final EIS.

<strong>B</strong>

Among the species for which the Chihuahuan Desert grasslands provide habitat is the Northern Aplomado Falcon ("Aplomado Falcon" or "Falcon"), listed as an endangered species since 1986. <u>See</u> Determination of the Northern Aplomado Falcon to Be an Endangered Species, 51 Fed. Reg. 6686, 6686-88 (Feb. 25, 1986). Although Falcons have only "sporadically" been seen in the United States in recent decades, the presence of breeding Falcons just across the border in Mexico led biologists to believe that the Falcon might be poised to repopulate portions of the plan area. Repopulation by the Falcon would depend on the preservation of suitable grassland habitat.

In June 2003, during the ongoing resource management plan amendment process, BLM concluded that revisions to the management plan were "likely to adversely affect" the Falcon. Accordingly, it requested in writing that FWS begin formal consultation, pursuant to § 7 of the ESA, regarding whether BLM's proposed action might jeopardize the Falcon's continued existence. 16 U.S.C. § 1536; <u>see also</u> 50 C.F.R. § 402.14 (detailing formal consultation requirements). Three months later, the Agency reversed course, retracted its determination that the RMP revisions were "likely to adversely affect" the Falcon, and informed FWS of its conclusion that formal consultation was therefore unnecessary. FWS

concurred in this revised determination, thus ending the formal consultation process and the agencies' study of likely effects on the Falcon.

## C

Three years after issuing the Draft EIS, in December 2003, BLM issued a Proposed Resource Management Plan Amendment ("RMPA") and Final EIS. Rather than selecting from among the alternatives analyzed in the Draft EIS, however, the abstract of the Final EIS explained that BLM had selected "a modified version (as a result of public input) of preferred Alternative A described and analyzed in the Draft RMPA/EIS."

This "modified version" of Alternative A ("Alternative A-modified") differed in a crucial respect from Alternative A:  Rather than limiting surface disturbances to areas within 492 feet of existing roadways, Alternative A-modified would instead limit disturbances to <u>any</u> 5% of the surface area of a leased parcel at a given time, regardless of location.[6]  In addition to the 5% disturbance cap, Alternative A-modified required "unitization," a management scheme under which different operators cooperate in exploration and well development with the goal of minimizing surface impacts.  "Unitization" was a

---

[6] Alternative A-modified also removed controlled surface use and timing limitations on more than 600,000 acres of the plan area.  This left 69% of the total plan area unrestricted—nearly twice the area Alternative A left unrestricted.

new creation, never previously used by BLM in managing surface resources.[7]

Although the sections of the Final EIS describing the management plan itself were modified to reflect these new requirements, the sections describing the plan's impacts on vegetation and wildlife were not substantially modified, because the EIS concluded that the changes "do not significantly alter . . . the analysis of the environmental consequences."[8]

Alternative A-modified did offer greater protection of the Otero and Nutt grasslands in one respect:  It prohibited development on 35,790 acres of "core habitat" for five years pending further study and development of an adaptive management strategy.  Thus, BLM presented the new alternative as responsive to the concerns of both industry and the environmental community.  The Agency reiterated in response to public questions that it was unnecessary to analyze the impacts of A-modified because the overall "impact assessment," judged based on the "anticipated level of surface disturbance," "remained essentially the same" as under Alternative A.  Based on this conclusion that the same or less surface

---

[7] As the New Mexico Energy, Minerals and Natural Resources Department indicated in a protest letter filed with BLM after final adoption of Alternative A-modified, the 5% and unitization requirements left open considerable questions about their implementation and thus, likely impacts.  For example, the Final EIS does not explain how the 5% cap will be calculated:  as a total percentage of the Plan area, as a percentage of each leased parcel, or by some other method.  Other protesters registered similar concerns.

[8] The impacts analysis in the Final EIS does include some added portions, but these do not address differences in impacts created by adoption of the new 5% and unitization requirements—the salient change for purposes of this litigation.

- 13 -

acreage would be disturbed under Alternative A-modified, BLM reasoned, there was no substantial change from an environmental standpoint. Regarding groundwater concerns, the Final EIS added a discussion of the effects of leasing on specific basins, including the Salt Basin Aquifer, but again concluded that "the impacts on groundwater resources are expected to be minimal," adding that "[t]ypically, natural gas wells make little water and the water produced can be disposed through the use of evaporation ponds."

**D**

In response to these changes, three New Mexico state agencies, a group of environmental organizations, and more than twenty-five members of the public filed formal protests with BLM. See 43 C.F.R. § 1610.5-2 ("Any person who participated in the planning process and has an interest which is or may be adversely affected by the . . . amendment of a resource management plan may protest such . . . amendment."). Of those protests reflected in the record, nearly all expressed concern regarding the changes to the Otero and Nutt grassland NSO stipulation. The New Mexico Energy, Mineral and Natural Resources Department, Earthjustice, and several citizens also objected to the level of assessment of likely impacts on groundwater. All protests were reviewed by BLM and ultimately dismissed.

Not long after these protests were filed, New Mexico Governor Bill Richardson released a review of the consistency of the Final EIS with state law.

- 14 -

<u>See</u> 43 C.F.R. § 1610.3-2(e) (giving governors of affected states 60 days in which to "identify inconsistencies and provide recommendations in writing" to the BLM State Director); Governor Bill Richardson's Consistency Review of and Recommended Changes to the U.S. Dep't of the Interior, Bureau of Land Mgmt.'s Proposed Resource Mgmt. Plan Amend. and Final Envtl. Impact Statement for Fed. Fluid Minerals Leasing and Dev. in Sierra and Otero Counties, March 5, 2004, <u>available at</u> http://www.emnrd.state.nm.us/MAIN/ Administration/News/GovsPlanforOteroMesa.pdf [hereinafter "Consistency Review"].  Governor Richardson concluded that the proposed management of the Otero Mesa was inconsistent with "numerous . . . state laws, rules, policies, programs, and plans, particularly those that relate to protecting the Chihuahuan Desert and New Mexico's ground water."  The Governor accordingly proposed an alternate management plan.  His plan closed roughly the same areas to leasing and imposed roughly the same NSO, controlled surface use, and timing stipulations as those proposed in Alternative B, along with some increases in protection compared to that alternative.  Most important to this appeal, the Governor proposed NSO stipulations that, unlike those proposed in Alternative B, would cover large portions of the Otero Mesa and Nutt grasslands.  The governor also proposed the imposition throughout the entire plan area of various surface use limitations not considered by BLM.

BLM declined to adopt the majority of the Governor's suggested modifications to the Final EIS and concluded that the EIS was consistent with "officially approved and adopted resource-related [state] policies and programs." However, the Agency did accept one major alteration proposed by the Governor, making the closure of 35,790 acres of core habitat on the Otero Mesa and Nutt grasslands permanent rather than temporary. The Agency announced this modification in a 23-page "supplement" to the Final EIS (the "SEIS"), issued on May 19, 2004. In response to the public outcry over the adoption of Alternative A-modified in the Final EIS, the SEIS provided a summary of changes between the Draft and Final EIS and some explanation of the reasons for the switch to Alternative A-modified. First, a segment addressing the Otero Mesa and Nutt grasslands explained that public comments led BLM to conclude that directional drilling—as required to access resources beneath the Mesa under either Alternative A or B—would not be feasible in the area, and accordingly, "there was a need to reevaluate the No Surface Occupancy stipulation, and consider a different approach that would similarly meet the resource objectives." Moreover, "BLM analysis indicates the grassland areas could be adequately protected utilizing a 5 percent maximum surface disturbance stipulation." Second, a subsection entitled "Further Analysis of Existing Data" concluded that because BLM predicted that the "reasonable foreseeable development" acreage would be 1,600 acres under any management scheme, the impacts of Alternatives A and A-

modified on habitat would not appreciably differ. Notably, BLM based its prediction of likely development solely on the exploration history and current lease status of lands in the plan area, without accounting for the management scheme in effect. Because BLM anticipated the same habitat impacts under either alternative, the SEIS concluded that the adoption of A-modified was within "the scope and analysis of the Draft RMPA/EIS and d[id] not significantly alter the alternatives or analysis of the environmental consequences."

The SEIS did include a chart comparing the potential environmental impacts of Alternative B, Alternative A-modified, and the No-Action Alternative. However, the chart did not estimate likely surface impacts under the 5% and unitization requirements. Thus, the SEIS included no new environmental impacts analysis beyond that in the Final EIS—which itself simply adopted the analysis of the Draft EIS on relevant points. BLM published a notice of availability of the SEIS in the federal register and held a 30-day public comment period. Notice of Change to Proposed Resource Management Plan Amendment; Notice of Public Comment Period, 69 Fed. Reg. 30718 (May 28, 2004).

Governor Richardson appealed the rejection of the majority of his proposed modifications to BLM's National Director ("Director"). See 43 C.F.R. § 1610.3-2(e). In addition, several environmental groups sent a joint letter to the Director requesting that BLM allow public review and comment on the Governor's recommendations. See id. The Director declined to do so and issued

- 17 -

a decision rejecting the Governor's appeal.  Notice of BLM Director's Response to an Appeal From the Governor of New Mexico, 70 Fed. Reg. 3550 (Jan. 25, 2005).  In the Record of Decision issued in January 2005 upon final adoption of the RMPA, BLM explained that there was no need for a separate comment period given the similarity between the Governor's proposal and Alternative B.

E

In April 2005, the State of New Mexico filed suit against BLM,[9] raising claims under NEPA, FLPMA, the NHPA, and the Administrative Procedure Act ("APA"), seeking declaratory and injunctive relief (the "New Mexico suit").  On May 20, BLM scheduled for July 20 a competitive oil and gas lease auction covering a 1600-acre parcel within the Bennett Ranch Unit (the "BRU Parcel"), adjacent to the parcel on which HEYCO found natural gas triggering the cascade of lease nominations that led to the RMPA process.  Six days later, a coalition of

---

[9] Plaintiffs included the State of New Mexico and its Governor; Attorney General; Historic Preservation Officer; Energy, Minerals and Natural Resources Department; Department of Game and Fish; and Environmental Department (collectively "the State" or "New Mexico").  Named as defendants were BLM, its Director, and the New Mexico State Director (collectively "BLM").

environmental groups filed a second suit (the "NMWA suit").[10] As amended,

this suit raised claims under NEPA, the ESA and FLPMA.

BLM went ahead with the July 20 auction, and HEYCO, the sole bidder,

purchased the lease. During the course of litigation, however, BLM agreed not

to execute the lease until resolution of the case.[11] HEYCO has continued to

prepare for the possibility of drilling, obtaining permits to build a pipeline to

service wells on this lease and others it holds nearby.

The NMWA suit was later consolidated with New Mexico's suit. Before

the two matters were consolidated, however, the Independent Petroleum

Association of New Mexico ("IPANM"), an organization promoting the interests

of independent oil and gas producers in the state, moved to intervene in the New

Mexico suit. After consolidation, IPANM moved to intervene in the NMWA suit

---

[10] The NMWA suit also named FWS, its regional and national directors, and the Department and Secretary of the Interior as defendants. Only the ESA claim implicates actions of the FWS defendants. Plaintiff organizations were NMWA, the Wilderness Society, the Sierra Club, the Natural Resources Defense Council, the National Wildlife Federation, the Southwest Environmental Center, Forest Guardians, and the New Mexico Wildlife Federation.

[11] The parties stipulated before the district court that they would avoid seeking preliminary injunctive relief. As part of this stipulation, BLM agreed not to execute the July 20 lease "until this case has been resolved or February 15, 2006, whichever is earlier." When proceedings before the district court had not terminated by that date, BLM filed a "notice of continued deferral of lease for Bennett Ranch Unit parcel," seeking to avoid preliminary injunction proceedings and indicating that BLM would give notice before executing the lease. Because no such notice has been filed in the district court or this court, we assume execution continues to be deferred.

as well.  Both motions were unopposed.  On August 8, 2005, the district court granted the motion to intervene in the State's suit.  Although the court later denied as moot IPANM's intervention in the NMWA suit, we now grant its request to intervene in that case from this point forward.[12]

After oral argument and an evidentiary hearing regarding Aplomado Falcon sightings in the plan area, the district court issued a September 27, 2006, opinion rejecting the plaintiffs' NEPA, ESA, FLPMA, and NHPA challenges to the RMPA process.  However, the court also held that BLM violated NEPA when it failed to conduct a site-specific environmental analysis of the likely impacts of leasing the BRU Parcel and ordered BLM to prepare such an analysis.  IPANM now appeals the district court's determination regarding the necessity of site-specific analysis.  The State and NMWA cross-appeal all other matters save the

_____

[12] The district court explained that "[s]ince the two cases are consolidated, and IPANM had been allowed to intervene in [the State's suit], it is not necessary that IPANM seek to intervene in the consolidated cases."  IPANM now contests this denial based on the well-established rule that consolidation is but a procedural tool and does not merge two cases such that parties to one case become parties to the other.  Johnson v. Manhattan Ry. Co., 289 U.S. 479, 496-97 (1933); Harris v. Illinois-California Express, Inc., 687 F.2d 1361, 1368 (10th Cir. 1982).  For the same reasons that IPANM qualified for mandatory intervention in the New Mexico suit, it also qualifies for mandatory intervention in the NMWA suit.  See Fed. R. Civ. P. 24(a) (providing for mandatory intervention by a party with an interest in the litigation, whose ability to protect that interest will be impaired by disposal of the suit, and whose interests are not adequately represented by an existing party).  We "generally follow[] a liberal view in allowing intervention under Rule 24(a)."  Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d 1091, 1103 (10th Cir. 2005).  Although IPANM did not explicitly move to intervene, we construe its brief requesting intervention as such a motion.

- 20 -

NHPA claim.

**F**

Since the issuance of the district court's opinion, the regulatory status of the Northern Aplomado Falcon has changed in a manner that affects this litigation. At the time of BLM's decisions to adopt the RMPA and to issue the July 20 lease, the Falcon was listed as an endangered species. Accordingly, in the district court, NMWA challenged BLM's ESA consultation process regarding effects of the RMPA on the Falcon. After the district court entered its order below, rejecting NMWA's argument on the merits, FWS reclassified the Falcon population in the area. In summer 2006, FWS issued a formal ruling in which it decided to reintroduce the Falcons into New Mexico and Arizona. See Establishment of a Nonessential Experimental Population of Northern Aplomado Falcons in New Mexico and Arizona, 71 Fed. Reg. 42298 (July 26, 2006). We must address whether these changes affect the liveness of NMWA's ESA challenge.

**II**

We begin, as we must, by considering jurisdictional issues.[13]  Because no other statute confers jurisdiction, our jurisdiction must flow from 28 U.S.C.

---

[13] At the outset, we must ensure that the parties have standing to bring their claims.  Doctor John's, Inc. v. City of Roy, 465 F.3d 1150, 1155 (10th Cir. 2006).  An environmental organization has standing if "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 181 (2000).  The plaintiff organizations attached to their opening brief in the district court several declarations in which members of NMWA, the Wilderness Society, Forest Guardians, and the Southwest Environmental Center assert plans to use the Otero Mesa in the future for specified aesthetic, recreational, and employment pursuits that would be harmed by development.  These declarations are plainly sufficient to support individual standing under Summers v. Earth Island Institute, 129 S. Ct. 1142, 1149-51 (2009), and Laidlaw, 528 U.S. at 183-84.  Each declaration describes the purpose of the organization as environmental conservation, and the interests at stake herein are "germane" to that purpose.  See Laidlaw, 528 U.S. at 181.  Further, because only declaratory and injunctive relief against BLM are sought, individual members need not be present for a court to afford relief.  See Colo. Envtl. Coal. v. Wenker, 353 F.3d 1221, 1241 (10th Cir. 2004).  Accordingly, these four organizations have standing to pursue this appeal.  Because no member of the remaining organizations submitted a declaration describing a sufficient individual injury, they lack standing.

In determining that New Mexico has standing because of the threat of environmental damage to lands within its boundaries, we consider that states have special solicitude to raise injuries to their quasi-sovereign interest in lands within their borders.  Massachusetts v. EPA, 549 U.S. 497, 519-20 (2007).  Here, New Mexico alleges harm to its lands as well as a financial burden through the costs of lost resources such as water from the Salt Basin Aquifer.  Id. at 522-23 (holding that a state has standing to sue for relief from pending environmental harm so long as the harm is sufficiently concrete); id. at 518-19 (recognizing that states may have concrete environmental interests even in lands they do not own (citing Georgia v. Tenn. Copper Co., 206 U.S. 230, 237 (1907)).  New Mexico has thus alleged an imminent injury that was caused by the RMPA and would be redressed by an injunction.

§ 1291, which allows appeal from all "final decisions" of the district courts.

BLM argues that the district court's order was not a final decision, but rather, an

unreviewable remand under the administrative remand doctrine. In addition,

BLM and IPANM argue that the plaintiffs' ESA claim is moot.[14]

**A**

"[A] decision is ordinarily considered final and appealable under § 1291

only if it ends the litigation on the merits and leaves nothing for the court to do

but execute the judgment." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 712

(1996) (quotation omitted). The finality requirement is designed to avoid the

waste and confusion engendered by piecemeal review of cases. See Bender v.

Clark, 744 F.2d 1424, 1426 (10th Cir. 1984). "[R]emand by a district court to an

administrative agency for further proceedings is ordinarily not appealable

because it is not a final decision." Trout Unlimited v. U.S. Dep't of Agric., 441

F.3d 1214, 1219 (10th Cir. 2006) (quoting Bender, 744 F.2d at 1426-27).

In this case, the district court determined that BLM failed to conduct

sufficient site-specific environmental analysis before auctioning leases for lands

within the plan area and instructed the Agency to conduct further assessment if it

---

[14] Before the district court, New Mexico raised an NHPA claim challenging the adequacy of BLM's consultation with Native American tribes. On appeal, IPANM urges this court to determine that the State lacked standing to raise this claim. Because the district court ruled in favor of BLM and New Mexico did not appeal that determination, the NHPA issue is not before us, and we need not determine whether New Mexico had standing to raise it.

wished to execute the lease in the Bennett Ranch Unit. All other challenges raised by the plaintiffs were resolved in BLM's favor. On its face, this order has all requisite components of a final order: It resolved all issues and granted the plaintiffs relief, enjoining issuance of the HEYCO lease until such analysis is complete. As the State points out, BLM is not bound to conduct a new EIS in response to the court's order; it could opt to refrain from granting any leases and thus obviate the need for an EIS. Even assuming that BLM completes a site-specific EIS, any challenge thereto must be brought in a new lawsuit.

BLM argues, however, that despite the appearance of finality, the court's order amounts to a "remand" to BLM and is thus non-final under administrative law principles. See, e.g., Bender, 744 F.2d at 1426-27. In effect, BLM argues that whenever a court order requires further action by an agency, the order constitutes a "remand," and we cannot review the matter until the agency acts and the parties return to court.

This argument fundamentally misunderstands the nature of a "remand" in an administrative case. Typically, a "remand" from a district court to an agency occurs when an agency has acted in an adjudicative capacity: A party to the adjudication appeals the agency's determination to a district court, and the district court instructs the agency to conduct further proceedings. Accordingly, when considering whether a remand has occurred in a given case, appellate

courts must consider the nature of the agency action as well as the nature of the

district court's order:

> [J]udicial review of administrative action comes in many forms. The
> administrative action may be essentially adjudicatory, essentially
> legislative, or some nonadversarial action such as grant of a license.
> The issue of finality is affected by the nature of the administrative
> proceeding and the framework of judicial review as well as the
> character of the remand order.

15B Charles Alan Wright et al., Federal Practice & Procedure: Jurisdiction and

Related Matters § 3914.32, at 237 (2d ed. 1992); see also Caesar v. West, 195

F.3d 1373, 1374 (Fed. Cir. 1999) ("Remands to administrative agencies, because

they mark a continuation of the case, are not generally considered final decisions

for jurisdictional purposes." (emphasis added)); Horizons Int'l, Inc. v. Baldrige,

811 F.2d 154, 158-59 (3d. Cir. 1987) ("The governing statute may authorize

judicial review of agency action that is essentially adjudicatory[,] . . . of

legislative rulemaking which is neither adjudicatory nor adversarial[,] . . .[or] of

the non-adversarial grant of a license. Each of these different kinds of agency

actions may present the issue of finality differently." (citations omitted)).

Although our own circuit has not explicitly elucidated these criteria in the past,

our precedent indicates that we view the remand rule as most appropriate in

adjudicative contexts. E.g., Rekstad v. First Bank Sys., Inc., 238 F.3d 1259,

1262 (10th Cir. 2001) (discussing exceptions to the remand rule which exist

because "if a district court remands an issue to an administrative agency and

essentially instructs the agency to <u>rule in favor of the plaintiff</u>," the agency may be precluded from appeal (emphasis added)); <u>Baca-Prieto v. Guigni</u>, 95 F.3d 1006, 1008 (10th Cir. 1996) (remanding a case to an Immigration Judge for further adjudication and noting that "this circuit follows the prevailing view that a district court order remanding <u>an action</u> to an administrative agency <u>for further proceedings</u> is generally considered a nonfinal decision" (emphases added)); <u>Bender</u>, 744 F.2d at 1426 (explaining that the district court, rather than making any final determination itself, had remanded for the agency to apply a different legal standard when adjudicating the determination at issue).

Looking to the characteristics that influence finality, including the nature of the agency proceeding and the character of the dispositive district court order, Wright, <u>supra</u>, the order below does not share the features of a typical remand. Here, the agency proceeding underlying the RMPA was a policymaking process based on the exercise of BLM expertise, better described as quasi-legislative than adjudicative. In challenging that proceeding, the plaintiffs did not contend that BLM wrongfully adjudicated their rights, but rather that its policymaking process was contrary to law and injured their interests. For that reason, BLM appeared in the district court as a traditional adversarial party, defending its own actions against challenges by the State and NMWA, rather than defending a ruling made by the Agency in a controversy between parties appearing before it.

As for the nature of the district court's order, it simply does not square with the traditional notion of a "remand," wherein the reviewing court returns an action to a lower court for further proceedings. The court's order did not require BLM to recommence a proceeding, or indeed to take any action at all—it simply enjoined BLM from further NEPA violations.[15] If the Agency wishes to allow oil and gas leasing in the plan area it must undertake additional analysis based on the district court's memorandum opinion, but it retains the option of ceasing such proceedings entirely. Thus, the nature of the court's injunction is wholly unlike a traditional remand.

As NMWA points out, if we accepted BLM's argument that an order of this sort constitutes a "remand" simply because an agency is involved, the practical consequences would be drastic: "[E]very victory by a plaintiff in a case brought pursuant to the APA [would] necessarily [be] a non-final 'remand' order."[16] NMWA Reply Br. at 3. Had Congress wished to allow appeal under the APA only when an agency prevails on all claims in the district court, it could have done so explicitly. It is unsurprising, then, that we have often treated

---

[15] Though a district court's label for its own action carries little weight in determining the nature of that action on appeal, we note that the court below did not couch its disposition as a "remand."

[16] This statement is technically overinclusive because we recognize exceptions to the administrative remand rule in a narrow set of cases. See Graham v. Hartford Life & Accident Ins. Co., 501 F.3d 1153, 1158-59 (10th Cir. 2007).

district court orders requiring further agency action under NEPA as final and reviewable in the past.[17]  See, e.g., Middle Rio Grande Conservancy Dist. v. Norton, 294 F.3d 1220, 1225 (10th Cir. 2002) (reviewing a district court decision requiring FWS to conduct an environmental impact study); Sierra Club v. Hodel, 848 F.2d 1068, 1074 (10th Cir. 1988) (reviewing a district court decision requiring BLM to conduct environmental analysis), overruled on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh, 956 F.2d 970, 973 (10th Cir. 1992) (en banc); see also High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630, 640 (9th Cir. 2004) (reviewing a district court decision requiring the Forest Service to conduct environmental analysis); Sierra Club v. Glickman, 156 F.3d 606, 612 (5th Cir. 1998) (reviewing a district court decision requiring the Department of Agriculture to consult under the ESA); Nat'l Audubon Soc'y v. Hoffman, 132 F.3d 7, 12, 19 (2d Cir. 1997) (reviewing a district court decision requiring the Forest Service to conduct environmental analysis).

---

[17] BLM points to one case where we applied the administrative remand doctrine to bar appellate review of a district court order holding that the Forest Service had violated FLPMA.  In Trout Unlimited, 441 F.3d at 1218-19, we held that a district court decision instructing the Forest Service to reconsider the issuance of a permit for reservoir use was not a "final order."  However, in that case the plaintiffs did not argue that the order below was final, but only that an exception to the finality rule applied.  Id. at 1218.  Thus, even if we considered the lower court order in that case similar for finality purposes to the memorandum opinion in this case, Trout Unlimited does not control our analysis.  Moreover, the permitting context of Trout Unlimited falls closer to the traditional concept of adjudication than the resource management plan process at issue here because it settles the rights of specific parties.

Both the nature of BLM's proceeding and the character of the decision below indicate that viewing that decision as a "remand" would strain common sense. Our treatment of similar orders in past cases bolsters that conclusion. We hold that the district court's order was not an administrative remand, but rather a final order that we have jurisdiction to review under 28 U.S.C. § 1291.

**B**

BLM and IPANM argue that FWS's summer 2006 decision to reintroduce the Aplomado Falcon into the plan area moots NMWA's challenge under the ESA. We agree and vacate the portion of the district court's order addressing this issue.

**1**

NWMA argues that BLM failed to comply with § 7(a)(2) of the ESA, which requires all federal agencies to formally consult with the federal wildlife agencies to "insure that any [agency action] is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species."[18] 16 U.S.C.

---

[18] During the pendency of this appeal, a series of executive actions buffeted this heretofore settled legal landscape. On December 16, 2008, the Departments of Commerce and Interior issued a final rule jointly adopting a regulation that narrowed the circumstances in which agencies must initiate consultation with FWS. See Interagency Cooperation Under the Endangered Species Act, 73 Fed. Reg. 76272 (Dec. 16, 2008) (to be codified at 50 C.F.R. pt. 402). On March 3, 2009, however, President Obama requested a review of the new regulation and instructed agencies in the interim to follow consultation procedures as they

(continued...)

- 29 -

§ 1536(a)(2); see also 50 C.F.R. § 402.01(b) (providing for "all . . . listed species" other than those overseen by the National Marine Fisheries Service, agencies "shall contact the FWS"). Despite the name, consultation is more than a mere procedural requirement, as it allows FWS to impose substantive constraints on the other agency's action if necessary to limit the impact upon an endangered species. Natural Res. Defense Council v. Houston, 146 F.3d 1118, 1125 (9th Cir. 1998); see 16 U.S.C. § 1536(b)(4), (d).

NMWA argues that BLM's September 2003 about-face regarding the likelihood of the RMPA adversely affecting the Falcon was arbitrary and capricious. Because of the summer 2006 reintroduction decision, however, the Falcon's status under the ESA has changed. At the time of BLM's issuance of the Final EIS, the Falcon was listed as an endangered species, to which § 7(a)(2) applied. See Determination of Northern Aplomado Falcon to Be an Endangered Species, 51 Fed. Reg. at 6686-88; see also 16 U.S.C. § 1532(6) (defining the term "endangered species"), § 1533(a) (empowering the Secretary of the Interior to "determine whether any species is an endangered species"). Since the promulgation of the reintroduction rule, the Falcon population in the plan area

[18](...continued)
existed before its adoption. Memorandum for the Heads of Executive Departments and Agencies, 74 Fed. Reg. 9753, 9753 (March 6, 2009). Because BLM must currently proceed as it would have prior to the December 16 regulation, we consider the procedures then in effect throughout our analysis.

falls under § 10(j) of the ESA, applicable to populations which are artificially introduced into an area outside the naturally existing range of a species. These populations are classified as "experimental." 16 U.S.C. § 1539(j); Establishment of Nonessential Experimental Population of Northern Aplomado Falcons in New Mexico and Arizona, 71 Fed. Reg. at 42298. The ESA provides that nonessential experimental populations outside the National Park and National Wildlife Refuge system are treated as "proposed to be listed" rather than endangered or threatened. § 1539(j)(2)(C); 50 C.F.R. § 17.83(a). As discussed, the § 7(a)(2) formal consultation process applies only to species listed as threatened or endangered and not to species that are merely proposed for listing. Compare § 1536(a)(2) (requiring agencies to consult with the wildlife agencies regarding endangered and threatened species), with (a)(4) (requiring agencies to confer with the wildlife agencies regarding any species "proposed to be listed"); see Enos v. Marsh, 769 F.2d 1363, 1367-69 (9th Cir. 1985) (interpreting the term "confer" as requiring only an informal discussion process rather than formal § 7 consultation).[19] Accordingly, BLM and IPANM ask us to conclude that

_____

[19] Although this distinction between the term "consult" and the term "confer" is not apparent on the face of the statute and has not been explicitly adopted in this circuit, it has been adopted by FWS and endorsed by the Ninth Circuit in Enos. See 50 C.F.R. § 402.10 ("A conference between a Federal agency and the Service shall consist of informal discussions concerning an action that is likely to jeopardize the continued existence of the proposed species."); see also Establishment of a Nonessential Experimental Population of Northern Aplomado Falcons in New Mexico and Arizona, 71 Fed. Reg. at 42302

(continued...)

NMWA's ESA challenge is moot because the Falcon population at issue is no longer subject to consultation, a contention we review de novo. See Chihuahuan Grasslands Alliance v. Kempthorne, 545 F.3d 884, 891 (10th Cir. 2008).[20]

In order for the federal courts to exercise jurisdiction, Article III of the Constitution requires that the controversy between the parties remain live throughout all stages of litigation. United States v. Seminole Nation of Okla., 321 F.3d 939, 943 (10th Cir. 2002). "A federal court has no power to give opinions upon moot questions or declare principles of law which cannot affect the matter in issue in the case before it." S. Utah Wilderness Alliance v. Smith, 110 F.3d 724, 727 (10th Cir. 1997). Attempting to persuade us that the controversy regarding the Falcon's ESA status remains live, NMWA directs us to a lawsuit currently pending before our court challenging the legality of FWS's decision to reclassify the Falcon on the basis that the "reintroduction" area is already within the existing range of the species. Forest Guardians v. U.S. Fish &

[19](...continued)
("[Nonessential experimental populations] provide additional flexibility because Federal agencies are not required to consult with us under section 7(a)(2). . . . Section 7(a)(4) requires Federal agencies to confer (rather than consult) with the Service on actions that are likely to jeopardize the continued existence of [such a] species."). The parties do not argue before us that this interpretation is mistaken, so we assume its validity for purposes of this case.

[20] NMWA points out that BLM did not argue mootness before the district court and urges us to reject BLM's arguments on that basis. This suggestion is unavailing; as a component of our jurisdiction, mootness is non-waivable. Mink v. Suthers, 482 F.3d 1244, 1257 (10th Cir. 2007).

Wildlife Serv., No. 08-2226 (10th Cir. filed Sept. 24, 2008); see 16 U.S.C. § 1539(j); 50 C.F.R. § 17.80(a) (defining the term "experimental population" to include an introduced population "only when, and at such times as the [introduced] population is wholly separate geographically from nonexperimental populations of the same species"). A favorable outcome for the appellant environmental group in that case would mean that the Falcon population at issue would once again be categorized as "endangered" and subject to the formal consultation requirement. But because mootness requires a live controversy at all stages, we must consider whether the controversy is live at the current phase of litigation under current law. Nor do we think it appropriate to prejudge the merits of another case before our court in order to determine whether the outcome the plaintiffs hope for can be considered "likely." Absent an applicable exception, the ESA challenge is moot, and we may proceed no further.

**2**

Despite its jurisdictional nature, mootness does admit of certain exceptions. See Seminole Nation of Okla., 321 F.3d 939, 944 (10th Cir. 2002). NMWA argues that the Falcon's reclassification, and the resulting inapplicability of the formal consultation requirement, amounted to a voluntary cessation of illegal behavior on the part of BLM and FWS. When a party moots a case by voluntarily changing its own conduct, the Supreme Court instructs us to view mootness arguments with suspicion because the offending party might otherwise

resume that conduct as soon as the case is dismissed.  Laidlaw, 528 U.S. at 189.

This voluntary cessation exception derives from "the principle that a party

should not be able to evade judicial review . . . by temporarily altering

questionable behavior."  City News & Novelty, Inc. v. City of Waukesha, 531

U.S. 278, 284 n.1 (2001); Chihuahan Grasslands Alliance, 545 F.3d at 893.

Thus, for a case to become moot, it must be "absolutely clear that the allegedly

wrongful behavior could not reasonably be expected to recur."  Laidlaw, 528

U.S. at 189.

This sensible rule does not apply to BLM, for a simple reason:  FWS, not

BLM, made the decision to alter the Falcon's status by reintroducing it to the

plan area.  Within the ESA context, BLM must engage in interagency

consultation with FWS.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.01.  Thus, for

consultation purposes, BLM and FWS operate as different actors, each with its

own goals and responsibilities, and it was FWS that decided to reintroduce and

thus reclassify the Falcon.  We see no attempt by BLM to alter its conduct and

thereby evade judicial review.

As for FWS, we agree that it was that agency's voluntary decision to

release Falcons into the plan area that led to the Falcon's change in regulatory

status.  Based on that decision, FWS granted $295,793 to nonprofit organization

the Peregrine Fund to begin releasing birds on BLM lands in New Mexico in

2007.  Forest Guardians, J.A. at 461-72 (copy of grant agreement between FWS

- 34 -

and the Peregrine Fund).[21]  The Fund has released some 100 birds altogether, of which at least 50 have successfully reached independence in the wild and some have begun to reproduce.  Bureau of Land Mgmt., U.S. Dep't of Interior, Rare Falcons Back in New Mexico, http://www.blm.gov/nm/st/en/fo/Socorro_Field_ Office/features/rare_falcons_back.html (last visited March 17, 2009) [hereinafter Rare Falcons Back]; Patricia Zenone, U.S. Fish & Wildlife Serv., Northern Aplomado Falcon Reintroductions in New Mexico in 2008, Fish & Wildlife Journal, Sep. 5, 2008, http://www.fws.gov/arsnew/regmap.cfm?arskey=24842 [hereinafter Falcon Reintroductions].  The presence of these birds makes it a practical impossibility for FWS to reverse reintroduction because an actual experimental population of Falcons now exists in the area at issue.[22]  Thus, FWS

---

[21] We take judicial notice of this document, which is included in the record before us in the Forest Guardians matter.  Van Woudernberg ex rel. Foor v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001) (en banc) ("[T]he court is permitted to take judicial notice of its own files and records."); see also Fed. R. Evid. 201(b).

[22] The websites of two federal agencies, BLM and FWS, and the minutes of the New Mexico State Resource Advisory Council contain numerous references to the releases.  E.g. Rare Falcons Back; Falcon Reintroductions; Bureau of Land Mgmt., New Mexico Resource Advisory Council, Minutes, http://www.blm.gov/ nm/st/en/info/resource_advisory.html (last visited March 18, 2009) (follow links for March 2008 and December 2006).  We conclude that the occurrence of Falcon releases is not subject to reasonable factual dispute and is capable of determination using sources whose accuracy cannot reasonably be questioned, and we take judicial notice thereof.  See Fed. R. Evid. 201(b); see also O'Toole v. Northrop Grumman Corp., 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the

(continued...)

cannot voluntarily reclassify the Falcon population in the area as "endangered" and thus revive plaintiffs' ESA challenge. We have before us an example of the rare case where it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Laidlaw, 528 U.S. at 189.

Accordingly, NMWA's ESA challenge to the consultation process between BLM and FWS regarding the Northern Aplomado Falcon is moot.

**3**

Given that NMWA has lost the opportunity to appeal from the district court's order rejecting its challenge to BLM's ESA consultation process, NMWA requests that we vacate the portion of that order on point. "Vacatur is in order when mootness occurs through happenstance—circumstances not attributable to the parties—or . . . the unilateral action of the party who prevailed in the lower court." Chihuahuan Grasslands Alliance, 545 F.3d at 891 (quoting Arizonans for Official English v. Arizona, 520 U.S. 43, 71-72 (1997) (omission in original)). Thus, we vacate that portion of the district court's decision.

**III**

Turning to the merits of those issues over which we have jurisdiction, we first consider the plaintiffs' NEPA claims. The centerpiece of environmental

---

[22](...continued)
world wide web."); City of Sausalito v. O'Neill, 386 F.3d 1186, 1223 n.2 (9th Cir. 2004) ("We may take judicial notice of a record of a state agency not subject to reasonable dispute.").

regulation in the United States, NEPA requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives. See 42 U.S.C. § 4331(b) (congressional declaration of national environmental policy); U.S. Dep't of Transp. v. Public Citizen, 541 U.S. 752, 756-57 (2004); Marsh v. Or. Natural Res. Council, 490 U.S. 360, 371 (1989); Forest Guardians v. U.S. Forest Serv., 495 F.3d 1162, 1172 (10th Cir. 2007). By focusing both agency and public attention on the environmental effects of proposed actions, NEPA facilitates informed decisionmaking by agencies and allows the political process to check those decisions. Marsh, 490 U.S. at 371; Balt. Gas & Elec. Co. v. Natural Res. Defense Council, 462 U.S. 87, 97 (1983) (identifying the facilitation of informed agency decisionmaking and public involvement as the "twin aims" of NEPA). The requirements of the statute have been augmented by longstanding regulations issued by the Council on Environmental Quality ("CEQ"), to which we owe substantial deference. Marsh, 490 U.S. at 372.

Before embarking upon any "major federal action," an agency must conduct an environmental assessment ("EA") to determine whether the action is likely to "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C); Carpenter, 463 F.3d at 1136 n.4; 40 C.F.R. § 1508.9. If not, the agency may issue a "finding of no significant impact" ("FONSI") stating as much. 40 C.F.R. § 1508.13. But if so, the agency must prepare a

-37-

thoroughgoing EIS, as BLM did here, assessing the predicted impacts of the proposed action on all aspects of the environment, including indirect and cumulative impacts.[23]  42 U.S.C. § 4332(2)(C); 40 C.F.R. pt. 1502 & §§ 1508.11, 1508.25(c).  In addition, an EIS must "rigorously explore and objectively evaluate" all reasonable alternatives to a proposed action, in order to compare the environmental impacts of all available courses of action.  40 C.F.R. § 1502.14.  For those alternatives eliminated from detailed study, the EIS must briefly discuss the reasons for their elimination.  Id.  At all stages throughout the process, the public must be informed and its comments considered. § 1503.1(a)(4) (public comment must be requested after publication of a draft EIS); § 1503.1(b) (public comment may be requested after publication of a final EIS but before a decision is made); § 1506.10 (requiring notice of draft and final EISs to be published in the federal register and setting time periods for public comment); § 1505.2 (requiring publication of a record of decision after the decision is made).

NEPA is silent, however, regarding the substantive action an agency may take—the Act simply imposes procedural requirements intended to improve environmental impact information available to agencies and the public.  Marsh, 490 U.S. at 371.  Even if scrupulously followed, the statute "merely prohibits

---

[23] Alternatively, if the agency prefers, it may issue an EIS without initially completing an EA.  Utah Envtl. Cong. v. Russell, 518 F.3d 817, 821 (10th Cir. 2008).

uninformed—rather than unwise—agency action." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351 (1989).

As with other challenges arising under the APA, we review an agency's NEPA compliance to see whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a); accord Utah Shared Access Alliance v. United States Forest Serv., 288 F.3d 1205, 1208 (10th Cir. 2002); see also Russell, 518 F.3d at 823 (NEPA challenges must be brought under the APA because NEPA provides no private cause of action). An agency's decision is arbitrary and capricious if the agency (1) "entirely failed to consider an important aspect of the problem," (2) "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," (3) "failed to base its decision on consideration of the relevant factors," or (4) made "a clear error of judgment." Utah Envtl. Cong. v. Troyer, 479 F.3d 1269, 1280 (10th Cir. 2007) (quotations omitted). Deficiencies in an EIS that are mere "flyspecks" and do not defeat NEPA's goals of informed decisionmaking and informed public comment will not lead to reversal. E.g., Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy, 485 F.3d 1091, 1098 (10th Cir. 2007); Ecology Ctr., Inc. v. U.S. Forest Serv., 451 F.3d 1183, 1189-90 (10th Cir. 2006).

When called upon to review factual determinations made by an agency as part of its NEPA process, short of a "clear error of judgment" we ask only whether the agency took a "hard look" at information relevant to the decision. See Citizens' Comm. to Save Our Canyons v. Krueger, 513 F.3d 1169, 1178 (10th Cir. 2008) (quotation omitted); see also 33 Charles Alan Wright & Charles H. Koch, Jr., Federal Practice & Procedure § 8335, at 176 (2006) ("Without engaging in review of the actual resolution of factual questions of this variety, courts, by using the hard look standard, assure that the agency did a careful job at fact gathering and otherwise supporting its position."). In considering whether the agency took a "hard look," we consider only the agency's reasoning at the time of decisionmaking, excluding post-hoc rationalization concocted by counsel in briefs or argument. Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1165 (10th Cir. 2002) (citing Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1565 (10th Cir. 1994)). "A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." Citizens' Comm., 513 F.3d at 1176. We review the district court de novo, applying the APA standard of review to the agency's actions without deferring to the district court's application of that standard. Id.

## A

According to the State and NMWA, NEPA requires BLM to complete a supplemental EIS specifically analyzing the likely environmental effects of

Alternative A-modified before adopting that alternative as the new management plan for the area, and its failure to do so was arbitrary and capricious. An agency must prepare a supplemental assessment if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns."[24] 40 C.F.R.§ 1502.9(c)(1)(i) (emphases added). When "the relevant environmental impacts have already been considered" earlier in the NEPA process, no supplement is required. Friends of Marolt Park v. U.S. Dep't of Transp., 382 F.3d 1088, 1096-97 (10th Cir. 2004). In a guide to NEPA published in the Federal Register, the CEQ states that a supplement is unnecessary when the new alternative is "qualitatively within the spectrum of alternatives that were discussed in the draft" and is only a "minor variation" from those alternatives. Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18035 (Mar. 17, 1981) [hereinafter "Forty Questions"].[25]

---

[24] A supplemental EIS is also required when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." § 1502.9(c)(1)(ii). Courts face cases arising under this prong of the regulation more frequently. See, e.g., Marsh, 490 U.S. at 374; Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1177-78 (10th Cir. 1999). New Mexico's challenge, however, is based on changes in the proposed action rather than new circumstances or information.

[25] We consider this document "persuasive authority offering interpretive guidance" regarding the meaning of NEPA and the implementing regulations. Davis v. Mineta, 302 F.3d 1104, 1125 n.17 (10th Cir. 2002).

Rather than offer additional environmental analysis of Alternative A-modified, BLM concluded in the SEIS that no further analysis was necessary because the same or less surface area would ultimately be developed under Alternative A or A-modified. For this reason, BLM determined that the change from Alternative A to Alternative A-modified was within the scope and analysis of the Draft EIS and did not substantially alter the environmental consequences as required to trigger the § 1502.9 supplementation requirement. BLM and IPANM continue to argue that Alternative A-modified was within the scope of the previous analysis, although for different reasons than a similarity in the final number of acres likely to be developed.[26]

In its ruling, the district court found that the question of whether Alternative A-modified would lead to greater habitat fragmentation than Alternative A was a factual dispute.[27] It then found that there was sufficient evidence in the record to support BLM's prediction; thus, the failure to conduct additional analysis in the SEIS was not arbitrary and capricious. The court also

---

[26] It is not entirely clear that these arguments survive the Olenhouse rule permitting us to consider only the justification the Agency provided at the time of its decision. 42 F.3d at 1565. Giving BLM the benefit of the doubt, we will consider all of BLM's justifications as subspecies of the general argument that Alternative A-modified is "within the scope" of the analysis conducted in the Final EIS.

[27] However, the court noted that it would not have accepted an argument that the same number of acres would be developed under either alternative; rather, the Agency was required to conclude that the fragmentation resulting from development under either plan would be similar.

found that actual habitat fragmentation under Alternative A-modified was dependent on factors that could not be analyzed at the planning stage.

On appeal, BLM and IPANM argue that BLM was not required to conduct further analysis in the SEIS because surface impacts were analyzed in the Draft EIS, and those impacts would differ only in degree, not in kind, under Alternative A-modified. Should we disagree, they urge us to adopt the district court's latter rationale, that such impacts cannot practicably be analyzed until the leasing stage when those effects become more definitive.[28] They further urge that, even if we reject these arguments, any error was harmless. BLM and IPANM no longer advance the position that analysis is excused because either the amount of surface development or the ultimate amount of habitat fragmentation is similar under Alternatives A and A-modified. This removes from the scope of our review one of the two rationales relied upon by the district court. DeJulius v. New Eng. Health Care Employees Pension Fund, 429 F.3d 935, 943 (10th Cir. 2005) ("[T]he other ground asserted below . . . has not been raised on appeal and is thus waived.").

---

[28] IPANM also argues Alternative A-modified is within the range of alternatives previously considered because it is less protective than Alternative B but more protective than the No-Action Alternative. This argument confuses our standard for assessing the reasonableness of the range of alternatives presented in an EIS—discussed in Part III.B below—with the standard for determining whether a supplemental EIS is required. Suffice it to say, an agency may not decline to analyze the alternative it actually adopts simply because the overall level of environmental protection it offers falls between that offered by analyzed alternatives.

**1**

As described above, Alternative A and Alternative A-modified differ primarily in the restrictions they place on surface disturbances on the Otero Mesa. Alternative A proposed a qualitative restriction on development: Disturbances would only be allowed near existing roads. Thus, they would remain contiguous rather than scattering across the landscape. By contrast, A-modified imposes a quantitative restriction: Disturbances may occupy only five percent of the Mesa at any one time.

By arguing that a difference in the degree of habitat fragmentation did not require a fresh impacts analysis, BLM neglects the fundamental nature of the environmental problem at issue. As is well documented in the record before us, the location of development greatly influences the likelihood and extent of habitat preservation. Disturbances on the same total surface acreage may produce wildly different impacts on plants and wildlife depending on the amount of contiguous habitat between them. BLM's analysis of Alternative A assumed the protections of large contiguous pieces of habitat from development. Alternative A-modified muddied this picture, doing away with any requirement of continuity of undisturbed lands. Although A-modified also requires developers to work together to minimize impacts—potentially increasing the continuity of surface developments—BLM provided so little explanation of this

"unitization" restriction that it is impossible to tell whether it would create the

same clustering of impacts as would the proximity restriction in Alternative A.[29]

Moreover, this is not a case where components of fully-analyzed

alternatives were recombined or modified to create a "new" alternative whose

impacts could easily be predicted from the existing analysis. Cf. Forty

Questions, 46 Fed. Reg. at 18035 (noting that a decision to build 5,000 housing

units would be within the scope of an EIS analyzing the effects of 4,000 or 6,000

houses and would not require a supplement). Nothing in the Draft EIS so much

as hinted at a percentage-based surface occupancy restriction for the Otero Mesa,

and there is no direct or reliable way to compare the fragmentation effects of that

restriction to the effects of the restrictions analyzed in the EIS. See California v.

Block, 690 F.2d 753, 772 (9th Cir. 1982) (concluding that supplemental analysis

is required when the selected alternative "could not fairly be anticipated by

reviewing the draft EIS alternatives").

More generally, we cannot accept that because the category of impacts

anticipated from oil and gas development were well-known after circulation of

the Final EIS, any change in the location or extent of impacts was immaterial.

Unsurprisingly, BLM provides no statutory or case law support for this

_____

[29] We are puzzled by BLM's assertion that the two alternatives are "qualitatively identical" because they share a goal of minimizing habitat fragmentation. The alternatives are only "qualitatively identical" if they would lead to identical development in identical locations.

proposition. If a change to an agency's planned action affects environmental concerns in a different manner than previous analyses, the change is surely "relevant" to those same concerns. 40 C.F.R. § 1502.9(c)(1)(i). We would not say that analyzing the likely impacts of building a dirt road along the edge of an ecosystem excuses an agency from analyzing the impacts of building a four-lane highway straight down the middle, simply because the type of impact—habitat disturbance—is the same under either scenario. See, e.g., Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1291-92 (1st Cir. 1996) (holding that a supplement was required where the adopted alternative "entail[ed] a different configuration of activities and locations, not merely a reduced version of a previously-considered alternative"). The situation at hand is no different. NEPA does not permit an agency to remain oblivious to differing environmental impacts, or hide these from the public, simply because it understands the general type of impact likely to occur. Such a state of affairs would be anathema to NEPA's "twin aims" of informed agency decisionmaking and public access to information. See Marsh, 490 U.S. at 371; Balt. Gas & Elec. Co., 462 U.S. at 97; Citizens Comm., 513 F.3d at 1177-78.

BLM's unanalyzed, conclusory assertion that its modified plan would have the same type of effects as previously analyzed alternatives does not allow us to endorse Alternative A-modified as "qualitatively within the spectrum of alternatives" discussed in the Draft EIS. Because location, not merely total

-46-

surface disturbance, affects habitat fragmentation, Alternative A-modified was qualitatively different and well outside the spectrum of anything BLM considered in the Draft EIS, and BLM was required to issue a supplement analyzing the impacts of that alternative under 40 C.F.R. § 1502.9(c)(1)(i).

**2**

BLM and IPANM also argue that even if the changes in fragmentation impacts between Alternative A and A-modified require further environmental analysis, such analysis was impracticable until the leasing stage because the overall level of development could not be sufficiently predicted at the RMPA stage. All environmental analyses required by NEPA must be conducted at "the earliest possible time." 40 C.F.R. § 1501.2; see also Kern v. BLM, 284 F.3d 1062, 1072 (9th Cir. 2002) ("NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment. Rather, it is designed to require such analysis as soon as it can reasonably be done."). Because the record reveals that BLM conducted an internal analysis of the fragmentation impacts of Alternative A-modified in 2004, we are convinced that such analysis was possible. Accordingly, we hold that NEPA requires BLM to release a supplemental EIS thoroughly analyzing its newly minted alternative at the planning stage.

**3**

Finally, BLM asks that we hold any error in its analysis to be harmless. The Agency contends that because members of the public had access to the SEIS and record of decision and were allowed to comment on each of these, the purposes of NEPA were fulfilled without further analysis. See 5 U.S.C. § 706 (establishing harmless error review of APA cases); Bar MK Ranches v. Yuetter, 994 F.2d 735, 740 (10th Cir. 1993) ("The harmless error rule applies to judicial review of administrative proceedings, and errors in such administrative proceedings will not require reversal unless Plaintiffs can show they were prejudiced."). While we agree that BLM's communication with the public, as far as it went, furthered NEPA's goals, it was no substitute for the substantive analysis required by section 1502.9(c)(1)(i). A public comment period is beneficial only to the extent the public has meaningful information on which to comment, and the public did not have meaningful information on the fragmentation impacts of Alternative A-modified. Informed public input can hardly be said to occur when major impacts of the adopted alternative were never disclosed. Thus, we cannot agree that the failure to thoroughly analyze the environmental impacts of Alternative A-modified in a public NEPA document was harmless.

Of course, every change however minor will not necessitate a new substantive analysis and repetition of the EIS process. To make such a

requirement would lead agencies into Xeno's paradox, always being halfway to the end of the process but never quite there. The selection of Alternative A-modified was not a minor change or oversight presenting such a dilemma.

**B**

Aside from the need to analyze the specific land use plan BLM eventually selected, NMWA also charges that BLM analyzed an unduly narrow range of alternatives during the EIS process. The Agency disagrees, arguing that Alternatives A and B and the No-Action Alternative were representative of the full range of reasonable planning alternatives for the area.

The "heart" of an EIS is its exploration of possible alternatives to the action an agency wishes to pursue. 40 C.F.R. § 1502.14. Every EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). Without substantive, comparative environmental impact information regarding other possible courses of action, the ability of an EIS to inform agency deliberation and facilitate public involvement would be greatly degraded. See Baltimore Gas & Elec. Co., 462 U.S. at 97. While NEPA "does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or impractical or ineffective," it does require the development of "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." Dombeck, 185 F.3d at 1174 (quotations and alteration omitted). It follows that

an agency need not consider an alternative unless it is significantly distinguishable from the alternatives already considered. Westlands Water Dist. v. U.S. Dep't of the Interior, 376 F.3d 853, 868 (9th Cir. 2004).

We apply the "rule of reason" to determine whether an EIS analyzed sufficient alternatives to allow BLM to take a hard look at the available options. Id. The reasonableness of the alternatives considered is measured against two guideposts. First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate. Westlands, 376 F.3d at 866. Second, reasonableness is judged with reference to an agency's objectives for a particular project.[30] See Dombeck, 185 F.3d at 1174-75; Simmons v. U.S. Army Corps of Eng'rs, 120 F.3d 664, 668-69 (7th Cir. 1997); Idaho Conservation League v. Mumma, 956 F.2d 1508, 1520 (9th Cir. 1992).

NMWA argues that BLM should have analyzed a management alternative that closed more than 17% of the plan area to leasing (the amount of land closed by Alternative B, the most restrictive option analyzed). BLM counters that although none of the analyzed plans would permanently close the bulk of the

---

[30] While an agency may restrict its analysis to alternatives that suit the "basic policy objectives" of a planning action, Seattle Audubon Soc'y v. Moseley, 80 F.3d 1401, 1404 (9th Cir. 1996), it may do so only as long as "the statements of purpose and need drafted to guide the environmental review process . . . are not unreasonably narrow," Dombeck, 185 F.3d at 1175. NMWA does not argue that the RMPA's statement of purpose was unreasonably narrow, as indeed it was not.

plan area to development, the alternatives varied widely in the acreage subject to various restrictions, up to and including closure. Moreover, BLM initially considered two alternatives that would have resulted in closure or imposition of an NSO stipulation over the entire plan area but summarily rejected these as inconsistent with BLM's reasonable use mandate and its projected "reasonable foreseeable development." BLM therefore argues that its alternatives covered a reasonable range of management possibilities. NMWA, however, suggests two specific alternatives that would provide a greater level of environmental protection and argues that each should have been analyzed: (1) closing the whole of the Otero Mesa to fluid minerals development, and (2) managing the Otero Mesa and other fragile and relatively undisturbed parts of the plan area as wilderness study areas. Neither possibility was considered by BLM at any stage during the NEPA process, despite being repeatedly raised during public comment periods and the formal protest period.

**1**

We begin with NMWA's argument that BLM was required to analyze an alternative prohibiting surface disturbances of the Otero Mesa. As discussed above, Alternative B, the most protective alternative analyzed by BLM, placed an NSO restriction on 116,206 acres of the 427,275-acre Mesa, approximately 27%. The remainder would be subject to controlled surface use stipulations, including a restriction allowing development only within 492 feet of existing

roads. NMWA points out that numerous organizations and members of the public advocated for a complete restriction on drilling on the Mesa during the planning process, and it argues that these comments illustrate that this was a reasonable management alternative which BLM should have analyzed.

First, we ask whether an alternative closing the entire Mesa falls within BLM's statutory mandate for land management.  FLPMA delegates authority to BLM to create and amend land use plans.  Under the statute, BLM must develop and revise land use plans so as to "observe the principle[] of multiple use."  43 U.S.C. § 1712(c)(1).  "Multiple use" means "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values."  § 1702(c).

BLM argues that an alternative that closes the entirety of the Otero Mesa to development violates the concept of multiple use.  But this argument misconstrues the nature of FLPMA's multiple use mandate.  The Act does not mandate that every use be accommodated on every piece of land; rather, delicate balancing is required.  See Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 58 (2004).  "'Multiple use' requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage."  Pub. Lands

Council v. Babbitt, 167 F.3d 1287, 1290 (10th Cir. 1999) (citing 43 U.S.C.

§ 1702(c)); see also Norton, 542 U.S. at 58.

It is past doubt that the principle of multiple use does not require BLM to

prioritize development over other uses. As we have reasoned in the past, "'[i]f

all the competing demands reflected in FLPMA were focused on one particular

piece of public land, in many instances only one set of demands could be

satisfied. A parcel of land cannot both be preserved in its natural character and

mined.'" Rocky Mtn. Oil & Gas Ass'n v. Watt, 696 F.2d 734, 738 n.4 (10th Cir.

1982) (quoting Utah v. Andrus, 486 F. Supp. 995, 1003 (D. Utah 1979)); see also

43 U.S.C. § 1701(a)(8) (stating, as a goal of FLPMA, the necessity to "preserve

and protect certain public lands in their natural condition"); Pub. Lands Council,

167 F.3d at 1299 (10th Cir. 1999) (citing § 1701(a)(8)). Accordingly, BLM's

obligation to manage for multiple use does not mean that development must be

allowed on the Otero Mesa. Development is a possible use, which BLM must

weigh against other possible uses—including conservation to protect

environmental values, which are best assessed through the NEPA process. Thus,

an alternative that closes the Mesa to development does not necessarily violate

the principle of multiple use, and the multiple use provision of FLPMA is not a

sufficient reason to exclude more protective alternatives from consideration.

BLM further argues that the purpose of the RMPA process was

inconsistent with any management alternative more restrictive than

Alternative B.  See Dombeck, 185 F.3d at 1174-75.  Specifically, BLM identifies the purpose of the RMPA as identifying lands suitable for fluid minerals development, and it concludes that any alternative that excludes or severely restricts such development would not be "reasonable."  According to the Final EIS, the purpose of the RMPA process was "to determine (1) which lands overlying Federal fluid minerals are suitable for leasing and subsequent development and (2) how those leased lands will be managed."  Contrary to BLM's arguments (and the district court's conclusion),[31] this stated purpose does not take development of the Mesa as a foregone conclusion.  To the contrary, the question of whether any of the lands in the plan area are "suitable" for fluid minerals development is left open, and is precisely the question the planning process was intended to address.  It would fit well within the scope of the plan objectives for BLM to conclude that no lands in the plan area are suitable for leasing and development.  Accordingly, a management alternative closing the Otero Mesa would have been fully consistent with the objectives of the RMPA.

Applying the rule of reason, we agree with NMWA that analysis of an alternative closing the Mesa to development is compelled by 40 C.F.R. § 1502.14.  Excluding such an alternative prevented BLM from taking a hard look at all reasonable options before it.  While agencies are excused from

---

[31] The district court found that BLM was operating under "a directive to facilitate the production of oil and gas from federal lands."  The record does not reveal a specific policy directive along these lines, nor does BLM cite one.

analyzing alternatives that are not "significantly distinguishable" from those already analyzed, <u>Westlands</u>, 376 F.3d at 868, the alternative of closing only the Mesa—which represents a small portion of the overall plan area—differs significantly from full closure. As discussed above, the lands at issue are extraordinary in their fragility and importance as habitat. Although the record indicates that most development interest in the plan area focuses on the Mesa, so too does the interest in conservation, as expressed by the public during the comment process. Yet Alternative B, the alternative that would conserve the largest portion of the Mesa, was a far cry from closure.[32] Given the powerful countervailing environmental values, we cannot say that it would be "impractical" or "ineffective" under multiple-use principles to close the Mesa to development. Accordingly, the option of closing the Mesa is a reasonable management possibility. BLM was required to include such an alternative in its NEPA analysis, and the failure to do so was arbitrary and capricious.

**2**

---

[32] BLM reminds us that, at the outset of the planning process, it briefly considered two more alternatives that would prevent surface development in the entire planning area. These alternatives are at one extreme of the spectrum of management possibilities. Having considered them does not relieve BLM of the duty to consider any other alternative along the spectrum between complete closure and Alternative B. Otherwise, an agency could exclude any alternative it wished by considering (and rejecting) an extreme. <u>See</u> <u>Dombeck</u>, 185 F.3d at 1175 (agencies must "take responsibility for defining the objectives of an action and then provide legitimate consideration to alternatives that fall between the obvious extremes").

Finally, NMWA argues that wilderness designation of some lands in the plan area provides another reasonable alternative.[33] Wilderness is defined as

> Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which . . .
> (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

16 U.S.C. § 1131(c). After passage of FLPMA in 1976, all public lands in the United States were inventoried by BLM to assess their suitability for wilderness preservation. See 43 U.S.C. § 1782; Utah, 535 F.3d at 1186-87. Lands determined by BLM to fit the statutory definition were recommended to Congress for formal designation as national wilderness under 43 U.S.C. § 1782(b). Norton, 542 U.S. at 59. Until Congress formally designates lands that have been recommended as wilderness, they are wilderness study areas, which BLM manages under an environmentally protective regime "so as not to impair" their wilderness qualities. § 1782(a), (c). Nonimpairment management implicates all potential uses of wilderness lands, including not only development leasing but activities such as off-road vehicle access and grazing. See 43 C.F.R.

---

[33] For a thorough explanation of the wilderness system and BLM's authority within it, see Utah v. U.S. Dep't of Interior, 535 F.3d 1184 (10th Cir. 2008).

§ 6302.11 (wilderness lands are open only to "uses consistent with the preservation of their wilderness character").

The lands at issue in this case were included in BLM's wilderness inventory process which took place from 1978 through 1990. As a result of this process, BLM recommended four areas within Sierra and Otero Counties for wilderness designation, and they are currently managed as wilderness study areas. BLM determined that the remainder of the plan area, including the Otero Mesa, lacked wilderness characteristics.

Although BLM's authority to recommend lands for Congressional wilderness designation expired in 1991 under the terms of § 1782, BLM has routinely decided to manage additional lands as wilderness under its general land use planning authority.[34] See 43 U.S.C. § 1712 (granting BLM authority to issue land management plans); Utah, 535 F.3d at 1188. NMWA argues that it was

_____

[34] NMWA spends considerable time anticipating and addressing an argument that BLM lacks the power to manage lands as wilderness if they were not designated as study areas before 1991, an interpretation BLM adopted in a settlement reached between BLM and the State of Utah in another case. See Utah, 535 F.3d at 1186 (holding that the question of BLM's power to designate study areas after the settlement was not ripe). BLM does not set forth this argument on appeal, so we need not consider it. We assume arguendo that wilderness study area designation under § 1712 is a lawful land management option.

unreasonable for BLM not to consider wilderness designation in the RMPA

NEPA documents.[35]

As stated above, an agency is not required to consider alternatives that are

unreasonable in light of the project's purposes. Dombeck, 185 F.3d at 1174-75;

Simmons, 120 F.3d at 668-69; Idaho Conservation League, 956 F.2d at 1520.

The stated purpose of the RMPA process was "to determine (1) which lands

overlying Federal fluid minerals are suitable for leasing and subsequent

development and (2) how those leased lands will be managed."  Wilderness

designation, however, controls all possible uses, not only whether an area may be

leased for oil and gas development.  BLM thus argues that such designation was

beyond the scope of the planning project.  We agree.  See Dombeck, 185 F.3d at

1175 (holding that "the Forest Service was fully authorized . . . to limit its

consideration to . . . alternatives designed to substantially meet the recreation

development objectives" of its planning process).  Because BLM's RMPA did

_____

[35] During the public comment period on the Draft EIS, NMWA presented BLM with an extensive reinventory of the wilderness characteristics of lands in the plan area.  In response, BLM considered whether these lands might have reverted to a wilderness state since being rejected during the earlier assessment. Ultimately, in a 2003 document, it substantially reaffirmed its earlier wilderness determinations, with one exception:  BLM found that a 10,665-acre area of the Nutt Grassland had been neglected in the earlier inventory process and determined that it met the criteria for wilderness designation.  Thus, BLM decided to manage this area "in a manner that will preserve the entire range of management options . . . until a land use plan revision is completed for the area." However, neither the Draft nor Final EIS mentioned this wilderness review or the general possibility of designating wilderness, even as to the Nutt Grassland area.

not govern all surface uses but only the development of subsurface fluid mineral resources, it was permissible for BLM to determine that a management option governing all surface uses was outside the scope of the plan's objectives. Cf. Or. Natural Desert Ass'n v. Bureau of Land Mgmt., 531 F.3d 1114, 1142-43 (9th Cir. 2008) (concluding that wilderness designation was a reasonable alternative when the land use plan at issue governed a broad array of surface uses). Accordingly, we hold that designation of wilderness study areas was reasonably excluded from BLM's analysis.

## C

The State contends that BLM's analysis of the environmental impacts of the various alternative management plans failed to sufficiently consider a crucial impact: possible contamination of the Salt Basin Aquifer (the "Aquifer"). BLM concluded in the Draft and Final EISs that any impacts of development on the Aquifer would be "minimal," and it defends that conclusion on appeal. The State argues that this determination is arbitrary and capricious because it is unsupported by evidence in the record.

New Mexico is correct that the EISs devote little analysis to the Aquifer—undisputedly an important water resource. But insignificant impacts may permissibly be excluded from full analysis in an EIS. See 40 C.F.R. § 1508.13 (allowing an agency to decline to prepare an EIS if it finds that an entire project has no significant environmental impacts); § 1508.27 (defining the "significance"

-59-

of impacts as a function of "both context and intensity").[36]  Thus, unless BLM's

decision that impacts would be "minimal" was itself arbitrary and capricious, no

further analysis was required regardless of the Aquifer's value as a freshwater

resource.[37]

In order for a factual determination to survive review under the arbitrary

and capricious standard, an agency must "examine[] the relevant data and

articulate[] a rational connection between the facts found and the decision

made."  Citizens' Comm., 513 F.3d at 1176; accord Or. Natural Res. Council

Fund v. Brong, 492 F.3d 1120, 1130 (9th Cir. 2007) (holding that BLM acted

arbitrarily where there was "no evidence" to support its estimate of the harm to

forest density that would be caused by a proposed logging project); see also

Russell, 518 F.3d at 831 (upholding an agency's conclusion that a project would

have no significant impacts because some evidence supported the finding that

harvesting trees within the area would actually save habitat over the long term);

_____

[36] Of course, effects must be considered cumulatively, and impacts that are insignificant standing alone continue to require analysis if they are significant when combined with other impacts.  40 C.F.R. § 1508.25(a)(2).  The State does not allege that effects on the Aquifer have any such cumulative impacts.

[37]  We agree with BLM that it was permissible to look only to the impacts of gas, not oil, development, because NEPA requires analysis only of "foreseeable" impacts, 40 C.F.R. § 1502.22, and the record shows that only gas development is likely to take place in the area.  If oil development becomes foreseeable, it is likely that assessment of its impacts would be required, given that the Final EIS and BLM's briefs acknowledge that oil development would have a much greater potential to cause groundwater contamination.

Citizens for Alternatives to Radioactive Dumping, 485 F.3d at 1098-99

(upholding an agency's decision not to analyze the likelihood of radioactive

waste contaminating groundwater through a specific rock layer because the

agency relied upon analysis, included in the record, of rock layers with greater

conductivity).  We consider only evidence included in the administrative record

to determine whether an agency decision had sufficient evidentiary support.

Citizens for Alternative Energy, 485 F.3d at 1096 (holding that we look only to

the record absent "extremely limited circumstances [such as] a strong showing of

bad faith or improper behavior" (quotation omitted)).

The district court below viewed New Mexico's challenge as a simple

disagreement with BLM's substantive conclusions, but this analysis

misapprehends the nature of the State's claim.  The State does not ask us to

decide whether BLM is correct that impacts will be minimal.[38]  Rather, the State

asks us to ensure that BLM's conclusion was based on the requisite "hard look"

at the evidence before it.  New Mexico fears that wastewater from operational

natural gas wells will be reinjected into porous underground rock formations

through disposal wells, causing contaminants in these waters to leak into the

Aquifer.  In the Final EIS, BLM concluded that such contamination was not a

_____

[38] We may overturn an agency's NEPA decisions on substantive grounds
only "if the appellants can demonstrate substantively that the agency's conclusion
represents a clear error of judgment."  Greater Yellowstone Coal. v. Flowers, 359
F.3d 1257, 1274 (10th Cir. 2004) (quotations omitted).  The State does not allege
that BLM's decision was so substantively lacking as to meet this standard.

realistic concern, stating without further analysis that "[t]ypically, natural gas wells make little water and the water produced can be disposed through the use of evaporation ponds."

Our first inquiry is whether BLM "examined the relevant data" regarding the likelihood of injection into, and resulting contamination of, the Aquifer. Strikingly, BLM points to no record evidence explaining (1) how much wastewater a natural gas well "typically" produces, (2) whether it is reasonable to believe that wells in the plan area will be "typical," or (3) how much wastewater can practicably be disposed of through evaporation. See Citizens for Alternative Energy, 485 F.3d at 1096. Upon our careful review, the evidence in the record instead tends to support New Mexico's view that nontrivial impacts are possible. The State points to studies concluding that geologically similar gas wells to those planned for the BRU produced 38 barrels, or 1,596 gallons, of water per well per day. At this rate, under the level of development predicted by BLM, up to 603,000 acre-feet of water of the estimated 15 million acre-feet in the Aquifer could be contaminated. Materials in the record also suggest that the rock formations making up the Aquifer are highly fractured and thus, especially susceptible to the dissemination of contaminants should any be reinjected.

A sibling circuit faced a similar issue in National Audobon Society v. Department of the Navy, 422 F.3d 174 (4th Cir. 2005). In that case, the Fourth Circuit reviewed a Navy decision regarding where to build an aircraft landing

field and hold training exercises. Id. at 181-82. As here, the Navy completed an EIS, but it declined to exhaustively analyze impacts on the migratory waterfowl that spent winters in the selected training location, id. at 183, because it concluded at the outset that any such impacts would be "minor," id. at 186. Carefully reviewing the administrative record, the court concluded that the "hard look" requirement was not satisfied: Because evidence in the record indicated that impacts on waterfowl were a possibility, and no evidence pointed to the opposite conclusion, it was impossible to say that the agency had sufficiently examined the evidence before reaching its determination. See id. at 187.

Like the Fourth Circuit in National Audobon Society, on this record we are wholly unable to say with any confidence that BLM "examined the relevant data" regarding the Salt Basin Aquifer before determining that impacts on the Aquifer would be "minimal." The record is silent regarding the source of BLM's determination that injection (and thus, contamination) is unlikely, and it does provide some support for a contrary conclusion. Though we do not sit in judgment of the correctness of such evidence, where it points uniformly in the opposite direction from the agency's determination, we cannot defer to that determination. See Or. Natural Desert Ass'n, 531 F.3d at 1142 ("We cannot defer to a void.").

BLM also argues that state and federal injection well and water-quality regulations are designed to prevent the feared contamination. But the existence

of these regulations does not preclude the possibility of contamination, even if the protections are intended to prevent such an outcome. Contravening the inference that existing protections are always 100% effective, the record contains evidence that, despite this regulatory scheme, groundwater contamination from gas wells has happened frequently throughout New Mexico in the past. Thus, the mere presence of these regulations cannot make up for BLM's failure to demonstrate that it "examined relevant data" supporting a finding that impacts on the Aquifer will be minimal.[39]

We accordingly hold that BLM acted arbitrarily by concluding without apparent evidentiary support that impacts on the Aquifer would be minimal. Of course, BLM is not precluded from making the same determination once again if it provides an evidentiary basis for doing so.

**D**

Although we have determined that BLM must conduct further analysis on several issues, we do not detract from the broad discretion it exercises in doing so. To quote our Fourth Circuit colleagues:

> It is important to place the foregoing analysis in some perspective. The final decision . . . is committed by law to the sound discretion of the [agency], once it has complied with the requirements of NEPA.

---

[39] If the record contained evidence supporting BLM's conclusion that the volume of water likely to be produced would not require injection, then such evidence might well be rationally connected to the decision not to analyze impacts on the Aquifer, satisfying the second prong of our review. Citizens' Comm., 513 F.3d at 1176.

> Our intention is in no way to wrest control of this ultimate decision
> from [BLM's] hands, or to make NEPA an insurmountable bar to
> agency action. However, the requirements that Congress has set
> forth in NEPA are not ones that we are free to disregard.

Nat'l Audubon Soc'y, 422 F.3d at 199. BLM disregarded NEPA when it failed to conduct a thoroughgoing environmental analysis of its chosen land management alternative, failed to consider the reasonable alternative of closing the entire Otero Mesa to fluid mineral development, and failed to demonstrate that it examined the relevant data regarding the likely impact of development on the Aquifer. Each of these failures was more than a mere flyspeck and thwarted NEPA's purposes by preventing both BLM and the public from accessing the full scope of required environmental information. Despite granting the Agency the full measure of respect and deference warranted by the arbitrary and capricious standard of review, we must reverse.

## IV

We now reach the sole issue appealed by defendant-intervenor IPANM: Whether NEPA requires BLM to produce an EIS analyzing the specific environmental effects of the BRU lease before issuing that lease.

As discussed above, after issuing the Final EIS and adopting Alternative A-modified as the new management plan for the area, BLM opened bidding for a lease on the BRU Parcel. The BRU Parcel is adjacent to the HEYCO exploratory well that struck gas and led to the outpouring of lease nominations that triggered

-65-

the RMPA process. Not surprisingly, HEYCO purchased the lease. In the district court, the State successfully argued that BLM was required to produce a site-specific EIS addressing the environmental impacts of an oil and gas lease on the BRU Parcel before issuing it. IPANM contends on appeal that NEPA requires no more than (1) an EIS at the RMPA stage and (2) a later EIS when HEYCO submits an APD. In other words, the parties dispute how the environmental analysis of drilling in the plan area should be "tiered" as planning progresses from the large scale to the small.[40]

Oil and gas leasing follows a three-step process. "At the earliest and broadest level of decision-making, the [BLM] develops land use plans—often referred to as resource management plans . . . ." Pennaco Energy, Inc. v. U.S. Dep't of Interior, 377 F.3d 1147, 1151 (10th Cir. 2004); see also 43 U.S.C. § 1712(a). Next, BLM issues a lease for the use of particular land. The lessee may then apply for a permit to drill, and BLM will decide whether to grant it. § 1712(e); Pennaco Energy, 377 F.3d at 1151-52, 43 C.F.R. §§ 1610.5-3, 3162.3-1(c). The parties dispute whether our precedents create a hard rule that no site-specific EIS is ever required until the permitting stage, or a flexible test

[40] "Tiering is appropriate when the sequence of statements or analyses is . . . [f]rom a program, plan, or policy environmental impact statement to . . . a site-specific statement or analysis." 40 C.F.R. § 1508.28. Because BLM began by analyzing the impacts of an area-wide management scheme, and the implementation of that scheme will lead to many individual smaller-scale impacts not yet considered, tiering is unquestionably appropriate here; the question is at what stage the next set of analyses must take place.

requiring a site-specific analysis as soon as practicable. If the latter, they dispute whether a site-specific EIS was practicable, and thus required, before issuance of the July 20 lease.

The parties' claims are primarily a dispute over the interpretation of NEPA and the CEQ regulations, which provide that assessment of a given environmental impact must occur as soon as that impact is "reasonably foreseeable," 40 C.F.R. § 1502.22, and must take place before an "irretrievable commitment of resources" occurs, 42 U.S.C. § 4332(2)(C)(v); Pennaco Energy, 377 F.3d at 1160. We do not pursue this interpretation with a clean slate, however, as we have already applied these provisions to the leasing context in several past cases.

This court first addressed the tiering of impacts analysis in the oil and gas leasing context in Park County Resource Council, Inc. v. U.S. Department of Agriculture, 817 F.2d 609 (10th Cir. 1987), overruled in part on other grounds by Village of Los Ranchos, 956 F.2d 970.[41] In that case, BLM had prepared an "extensive" EA before issuing leases, concluded that leasing would have no immediate environmental impacts, and issued a FONSI concluding that an EIS was unnecessary at that stage. Id. at 612. Reviewing the decision to issue a FONSI rather than an EIS, we noted that no exploratory drilling had occurred in the entire plan area at the time the lease was issued, id. at 613, and there was no evidence

---

[41] Park County was decided under a "reasonableness" standard of review, which we rejected in Village of Los Ranchos in favor of the arbitrary and capricious standard we apply herein. 956 F.2d at 972.

that full field development was likely to occur, id. at 623.  Moreover, the leased

parcel consisted of over 10,000 acres (more than six times the size of the BRU

Parcel).  Id. at 613.  Thus, as a common sense matter, a pre-leasing EIS would

have "result[ed] in a gross misallocation of resources" and "diminish[ed] [the]

utility" of the assessment process, and we affirmed the FONSI.  Id. at 623

(quotation omitted).  We concluded that preparation of both plan-level and site-

specific environmental impacts analysis was permissibly deferred until after

leasing:

> As an overall regional pattern or plan evolves, the region-wide
> ramifications of development will need to be considered at some
> point.  A singular, site-specific APD, one in a line that prior to that
> time did not prompt such a broad-based evaluation, will trigger that
> necessary inquiry as plans solidify.  We merely hold that, in this case,
> developmental plans were not concrete enough at the leasing stage to
> require such an inquiry.

Id. (emphasis added).  After leasing and prior to issuance of an APD, the agency

had drafted an EIS, id. at 613, and NEPA was thus satisfied, id. at 624.  IPANM

argues that under Park County, BLM may routinely wait until the APD stage to

conduct site-specific analysis, even without issuing a FONSI.

We next had occasion to consider tiering in the oil and gas context in

Pennaco Energy.  In that case, BLM issued leases for coal bed methane ("CBM")

extraction on public lands in Wyoming.  377 F.3d at 1152.  A plan-level EIS for

the area failed to address the possibility of CBM development, and a later EIS was

prepared only after the leasing stage, and thus "did not consider whether leases

should have been issued in the first place." Id. Because the issuance of leases gave lessees a right to surface use, the failure to analyze CBM development impacts before the leasing stage foreclosed NEPA analysis from affecting the agency's decision. Id. at 1160. Accordingly, we held that in the circumstances of that case, an EIS assessing the specific effects of coal bed methane was required before the leasing stage.[42] As in Park County, the operative inquiry was simply whether all foreseeable impacts of leasing had been taken into account before leasing could proceed. Unlike in Park County, in Pennaco Energy the answer was "no."

Taken together, these cases establish that there is no bright line rule that site-specific analysis may wait until the APD stage.[43] Instead, the inquiry is necessarily contextual. Looking to the standards set out by regulation and by statute, assessment of all "reasonably foreseeable" impacts must occur at the earliest practicable point, and must take place before an "irretrievable commitment

---

[42] We are cognizant that Pennaco Energy arose in a very different posture from the present appeal: Because the case came before the district court on BLM's appeal from a decision of the Interior Board of Land Appeals ("IBLA"), we owed deference to IBLA's decision to conduct site-specific analysis, rather than to BLM's initial decision not to conduct such analysis. 377 F.3d at 1156 & n.5. However, we could not have affirmed IBLA's decision, regardless of the level of deference, if there were an hard-and-fast rule that assessment need not occur until the APD stage.

[43] Even in Park County, when we approved delaying analysis until the APD stage, we did so based on the specific findings of an EA and FONSI, the first steps in the NEPA process. Here, BLM did not issue a FONSI.

of resources" is made. 42 U.S.C. § 4332(2)(C)(v); Pennaco Energy, 377 F.3d at 1160; Kern, 284 F.3d at 1072; 40 C.F.R. §§ 1501.2, 1502.22. Each of these inquiries is tied to the existing environmental circumstances, not to the formalities of agency procedures. Thus, applying them necessarily requires a fact-specific inquiry. Both the Ninth Circuit and the District of Columbia Circuit have reached the same conclusion. See N. Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d 969, 973, 977-78 (9th Cir. 2006) (concluding that an agency's failure to conduct site-specific analysis at the leasing stage may be challenged, but that a "particular challenge" lacked merit when environmental impacts were unidentifiable until exploration narrowed the range of likely drilling sites); Sierra Club v. Peterson, 717 F.2d 1409, 1415 (D.C. Cir. 1983) (concluding that an agency may wait to evaluate environmental impacts until after the leasing stage if it lacks information necessary to evaluate them, "provided that it reserves both the authority to preclude all activities pending submission of site-specific proposals and the authority to prevent proposed activities if the environmental consequences are unacceptable").

Applying these standards to the July 20 lease, we first ask whether the lease constitutes an irretrievable commitment of resources. Just as we did in Pennaco Energy, 377 F.3d at 1160, and the D.C. Circuit did in Peterson, 717 F.2d at 1412, 1414, we conclude that issuing an oil and gas lease without an NSO stipulation

constitutes such a commitment.[44]  The same regulation we cited in <u>Pennaco Energy</u> remains in effect and provides that HEYCO cannot be prohibited from surface use of the leased parcel once its lease is final.  <u>See</u> 43 C.F.R. § 3101.1-2 ("A lessee shall have the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold subject to:  Stipulations attached to the lease . . . [and other] reasonable measures . . . .").  Because BLM could not prevent the impacts resulting from surface use after a lease issued, it was required to analyze any foreseeable impacts of such use before committing the resources.

Accordingly, the next question is whether any environmental impacts were reasonably foreseeable at the leasing stage.  Considerable exploration has already occurred on parcels adjacent to the BRU Parcel, and a natural gas supply is known to exist beneath these parcels.  Based on the production levels of existing nearby wells, the record reveals that HEYCO has concrete plans to build approximately 30 wells on the BRU Parcel and those it already leases, and it has obtained the necessary permits for a gas pipeline connecting these wells to a larger pipeline in Texas.  We agree with the district court that the impacts of this planned gas field were reasonably foreseeable before the July 20 lease was issued.  Thus, NEPA

---

[44] Internal BLM documents also support this conclusion.  BLM Handbook H-1624-1 ("By law, these impacts must be analyzed before the agency makes an irreversible commitment.  In the fluid minerals program, this commitment occurs at the point of lease issuance.").

required an analysis of the site-specific impacts of the July 20 lease prior to its issuance,[45] and BLM acted arbitrarily and capriciously by failing to conduct one.[46]

## V

New Mexico raises a single claim under FLPMA, arguing that BLM had a statutory duty to circulate Governor Richardson's alternative proposed management plan to the public and specifically invite comment upon it, which it failed to do. Because FLPMA, like NEPA, creates no private right of action, we also review this issue under the APA's arbitrary and capricious standard. Utah v. Babbitt, 137 F.3d 1193, 1203 (10th Cir. 1998).

---

[45] In every EIS, NEPA requires cumulative analysis of possible environmental impacts. See 40 C.F.R. § 1508.25(c) (requiring analysis of direct, indirect, and cumulative impacts). Accordingly, BLM is obligated under well-established law to analyze the effects of development on HEYCO's existing leases; roads and pipelines constructed to reach its wells; and any other impacts it can foresee at this stage.

New Mexico argues that BLM has not yet sufficiently analyzed the impacts of the approved pipeline. The State does not ask us to overturn BLM's approval of the pipeline permits (nor could it, as it did not request such relief below); to the contrary, it urges that analysis of impacts from the pipeline should occur alongside analysis of all other aspects of oil and gas development of the BRU Parcel. Based on the principal of cumulative impacts, we agree.

[46] NMWA urges that in the Record of Decision memorializing the adoption of Alternative A-modified, BLM committed to undertake site-specific environmental review before the issuance of any leases, and that this commitment was binding under 40 C.F.R. § 1505.3, which provides that "[m]itigation and other conditions established in the environmental impact statement or during its review and committed as part of the decision shall be implemented" (citation omitted). Given our holding that site-specific review was required at the leasing stage under NEPA itself, we need not reach this argument.

FLPMA requires BLM to coordinate its land use planning with state governments. 43 U.S.C. § 1712(c)(9) (providing that BLM shall "coordinate the land use inventory, planning, and management [of federal lands] with the land use planning and management programs . . . of the States and local governments within which the lands are located"). Governors must have the opportunity to advise BLM of their positions on draft land use plans, and BLM must consider this input and ensure that "land use plans . . . [are] consistent with State and local plans to the maximum extent . . . [the Secretary of the Interior] finds consistent with Federal law."[47] Id.

To facilitate BLM's consistency review, BLM must notify state governments of proposed resource management plans and amendments and "identify any known inconsistencies with State or local plans, policies or programs." 43 C.F.R. § 1610.3-2(e). The governor's office then has 60 days to identify inconsistencies with state law and policy and make recommendations in writing. Id. Finally, if BLM does not accept these recommendations, the state may appeal to the BLM National Director, who "shall accept the recommendations of the Governor(s) if he/she determines that they provide for a reasonable balance between the national interest and the State's interest." Id. BLM and New Mexico followed this procedure. Governor Richardson signed his "Consistency Review of and

---

[47] New Mexico has abandoned its argument below that the RMPA is substantively inconsistent with state plans in violation of this statute.

Recommended Changes to" the Final EIS on March 5, 2004, accompanied by a press release and published on a state website.[48] BLM declined to adopt the bulk of the Governor's proposals, and the state appealed to the Director, who denied the appeal.

In addition to notifying the state of any perceived inconsistencies, regulations also require BLM to ensure that members of the public have the opportunity to review and comment on a state's written recommendations. Section 1610.3-2(e) provides:

> If the written recommendations of the Governor(s) recommend changes in the proposed plan or amendment which where not raised during the public participation process on that plan or amendment, the State Director shall provide the public with an opportunity to comment on the recommendation(s).

BLM did not circulate the Governor's recommendations to the public or specifically solicit comments on those recommendations at any time.

We conclude that BLM nonetheless provided a sufficient opportunity to comment.[49] As described above, BLM responded to Governor Richardson's

---

[48] We take judicial notice of the existence and online availability of the review and accompanying press release. See Consistency Review; Press Release, N.M. Energy, Minerals and Natural Res. Dep't, Governor Bill Richardson, ENMR Sec'y Joanna Prukop Issue N.M.'s Response to BLM Proposal for Otero Mesa Governor's Plan Offers More Protections for Env't & Wildlife (March 8, 2004), available at http://www.emnrd.state.nm.us/MAIN/Administration/News/ GovernorsOteroMesaPlanRel.pdf.

[49] Thus, we need not determine, as the district court did, whether such an opportunity was required—that is, whether the Governor's plan suggested

(continued...)

recommendations by rejecting the majority of his proposals but adopting the

suggestion that certain core habitat areas be permanently closed to leasing.

Accordingly, BLM issued an SEIS describing this change.  The SEIS was

circulated to the public,[50] and the Governor's consistency review was posted on

BLM's website.[51]  In the cover letter accompanying the SEIS, BLM explained that:

> This supplement is intended to . . . [i]dentify the three areas that the
> Governor of New Mexico has recommended for closure to leasing,
> and that BLM is now proposing to close to leasing[, and to a]llow the
> public an opportunity to comment on these issues (emphasis added).

Similarly, in its statement of purpose, the SEIS explained that the habitat closure

was suggested by the governor during his § 1610.3-2(e) consistency review:

> During the . . . 30-day public protest period and 60-day Governor's
> Consistency Review period, BLM received feedback indicating
> concern about the extent of changes made between the Draft EIS and
> the Final EIS.  The perception by the Governor of New Mexico and
> many of the public is that the changes between the Draft and Final
> are significant, and that there should have been an opportunity for
> the BLM to receive public input in the form of comments prior to
> issuance of the Final EIS.  In addition, the Governor of New Mexico
> has recommended that two areas . . . be permanently closed to
> leasing (emphases added).

---

[49](...continued)
changes not previously raised during the public participation process.

[50] Specifically, the SEIS was sent to the individuals who had requested
copies of earlier documents related to the RMPA process and to relevant federal,
state, tribal, and local agencies.

[51] The Record of Decision confirms that BLM placed the review on its
website.

A notice of the availability of the SEIS was published in the Federal Register, explaining that the habitat changes therein were adopted "[i]n response to recommendations offered by the Governor of New Mexico, made pursuant to 40 C.F.R. 1610.3-2." 69 Fed. Reg. at 30718. The public was given thirty days from publication of the notice to comment on the SEIS. Id. During this comment period, BLM received many comments related to the contents of the Governor's review.

We conclude that because BLM circulated an SEIS that discussed the Governor's consistency review, published a notice in the Federal Register of the SEIS comment period mentioning the Governor's review, and both BLM and New Mexico posted the review on their websites, the public was apprised of the existence of the Governor's review and was afforded an "opportunity to comment" on his proposals. Indeed, many citizens took advantage of this opportunity. A meaningful opportunity to comment is all the regulation requires. It does not require BLM to circulate copies of the Governor's review as a matter of course.[52] The opportunity provided by BLM was sufficient, assuming any opportunity was required, and the State's challenge must fail.

---

[52] We do not foreclose the possibility that circulation might be necessary to provide a meaningful opportunity to comment in different circumstances.

## VI

For the foregoing reasons, we **VACATE** as moot that portion of the district court's order disposing of NMWA's ESA challenge. We **AFFIRM** the district court's determination that BLM complied with FLPMA, **AFFIRM** its finding that NEPA requires BLM to conduct further site-specific analysis before leasing lands in the plan area, and **REVERSE** its conclusion that BLM complied with NEPA in its plan-level analysis.